

**FILED**

Jul 23 2020, 8:44 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Anthony J. Saunders
New Castle, Indiana

ATTORNEY FOR APPELLEE

Joel E. Harvey
New Castle, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Virginia Madden, <br> *Appellant-Respondent,* <br><br> v. <br><br> Robert Phelps, <br> *Appellee-Petitioner.* | July 23, 2020 <br><br> Court of Appeals Case No. <br> 19A-JP-2630 <br><br> Appeal from the Henry Circuit Court <br><br> The Honorable Kit C. Dean Crane, Special Judge <br><br> Trial Court Cause No. <br> 33C01-1105-JP-16 |

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Respondent, Virginia Madden (Mother), appeals the trial court's Order modifying custody of the parties' minor child, B.P., in favor of Appellee-Petitioner, Robert Phelps (Father), and ordering Mother to pay attorney's fees and parenting coordinator fees.

We affirm in part and reverse in part.

# ISSUES

Mother presents the court with four issues, which we restate as the following three:

> (1) Whether the trial court's award of sole legal custody and primary physical custody to Father was clearly erroneous;
>
> (2) Whether the trial court's contempt finding against Mother and award of $1000 in attorney's fees to Father was clearly erroneous; and
>
> (3) Whether the trial court's order that Mother pay $3,645.50 in parenting coordinator fees was clearly erroneous.

# FACTS AND PROCEDURAL HISTORY

On January 20, 2011, B.P. was born to Mother and Father (collectively, Parents). Parents, B.P., and Mother's two children from a prior relationship resided at a home on Prairie Knoll Drive in New Castle, Indiana, which had been left in trust to Mother's two older children by their deceased father. After

Parents terminated their relationship, Mother continued to reside at the Prairie Knoll home for a time, and Father resided in Bloomington, Indiana. On April 9, 2012, Father's paternity was established by entry of a judgment that provided that Parents would share joint legal custody but Mother would have primary physical custody of B.P. At the age of three, B.P. was diagnosed with a language disorder and developmental delay. When he was four years old, B.P. was diagnosed with autism spectrum disorder. It was recommended at that time that B.P. receive more intensive school services than he was currently receiving, that he continue with outpatient occupational and speech therapy, and that Parents receive education and support to assist with consistent parenting. B.P. has an individualized education plan at his public school. His therapists have recommended that he engage in group activities outside of school to assist in his social development.

[5] Parents' attempts to co-parent B.P. were not without conflict. Between April 26, 2012, and January of 2018, Father filed three contempt motions and a rule to show cause motion against Mother. During the same period, Mother filed motions to modify child support and to mandate counseling for B.P. as well as two motions seeking to have Father held in contempt and to have his parenting time modified. Parents agreed to the use of a parenting coordinator. One coordinator was engaged but withdrew when Mother did not pay her portion of the coordinator's fees.

[6] On February 5, 2018, after further litigation between Parents, the trial court entered an order appointing Dr. Erica Kane (Dr. Kane) as a parenting

coordinator whose mandate was to assist Parents to resolve their issues without court intervention. Dr. Kane was to make binding recommendations for the parties if they were unable to agree, but she was not to "serve as a custody evaluator in the case" or "offer a binding recommendation for a change in [B.P.'s] primary physical residence[.]" (Appellant's App. Vol. II, p. 47). Parents were to pay equal shares of Dr. Kane's fees, but the trial court's appointment order also provided that Dr. Kane had

> the discretion to report to the [c]ourt that [she] desires to charge either party separately for individual contacts with that party or joint contacts made necessary by that party's behavior. The [c]ourt shall have the power to review, reallocate and enforce the payment of the fees of the [parenting coordinator].

(Appellant's App. Vol. II, pp. 43-44).

[7]     The current phase of litigation between Parents began on March 16, 2018, when Father filed a verified notice of intent to relocate to New Castle to take advantage of an employment opportunity and to be closer to B.P. Father's notice also included a request to modify parenting time to two-week blocks spent at each parent's home. Mother objected to Father's proposed modification of parenting time. The trial court referred the matter to mediation, but mediation was never scheduled.

[8]     In the spring of 2018, Parents could not agree on whether B.P. should participate in baseball and soccer. As per the parenting coordinator order, Dr. Kane issued a binding recommendation that B.P. should participate because

those activities would assist in his socialization. B.P. attended all practices and games when he was in Father's care, but Mother did not take B.P. to sports when he was with her.

[9] In May of 2018, Mother was notified by the trustees of the trust holding the Prairie Knoll home that she would be required to vacate within thirty days. Mother moved out of the Prairie Knoll home in June of 2018 but did not file a notice of intent to relocate with the trial court. In June of 2018, the Department of Child Services (DCS) substantiated a finding of neglect against Mother when B.P. sustained bruising on his neck after one of Mother's other children shoved him while he was in Mother's care. Parents participated in an informal adjustment which was extended until January of 2019 because Mother did not confirm her current address and had home inspections done at three different homes during the adjustment. The closeout report for the informal adjustment noted that Parents "will not agree on how to raise [B.P.] other than he does need services to help him thrive." (Exh. Vol., p. 73). Mother and Father have reported each other to DCS on eleven occasions.

[10] Parents disagreed about Father's summer 2018 parenting time. Father had timely submitted his proposed dates, but Mother disagreed with his selected schedule. In July of 2018, Dr. Kane made a binding recommendation that Parents follow Father's selected schedule for summer parenting time. On August 1, 2018, Father filed a contempt motion against Mother alleging that Mother had not followed Dr. Kane's binding recommendations on summer parenting time, Mother had moved from the Prairie Knoll home without filing

the required notice of intent to relocate, and Mother failed to communicate with him. On August 28, 2018, the trial court found Mother in contempt for refusing Father summer parenting time and ordering her to serve thirty days in jail. The trial court allowed Mother to purge herself of her contempt by providing Father with thirty-four days of consecutive parenting time. The trial court also ordered Mother to pay $750 to Father's attorney.

[11] On January 22, 2019, Father filed a motion for contempt and mediation seeking payment of uninsured dental expenses Mother had been previously ordered to pay, mediation of his March 16, 2018, parenting-time modification motion, and payment of the $750 in attorney's fees Mother had been ordered to pay after she had been found in contempt. The parties engaged in mediation. On March 18, 2019, the mediator filed the Mediated Partial Agreement (MPA) with the trial court that provided, *inter alia*, that Parents would communicate with each other via email on decisions for B.P. regarding routine health care, education, religion, and extracurricular activities. If one parent failed to object to the other's proposed decision on one of these issues within forty-eight hours, it was considered an agreement. If no agreement was reached on a healthcare or religious decision, either parent could petition the trial court for a hearing. Any unresolved disagreement regarding extracurricular activities was to be referred to the parenting coordinator for a binding recommendation. Mother was also to provide Father within ten days with a current utility bill held in her name for the Prairie Knoll home as well as proof of her payment of that utility bill. The MPA provided that "Mother states that she is residing full time at [the Prairie

Knoll home]." (Appellant's App. Vol. II, p. 68). The MPA provided that "physical custody, parenting time, child support and 2018 uninsured health expenses" were the issues remaining to be resolved by the trial court. (Appellant's App. Vol. II, p. 69). Mother signed the MPA, which was subsequently approved by the trial court. Mother did not provide Father with the utility bill and proof of payment required by the MPA.

[12] In May of 2019, Father moved to a home in New Castle that was located approximately eight miles from his previous home. Father notified his attorney of his move in April of 2019, but his attorney did not file a notice of intent to relocate with the trial court. Father's move did not result in any change in B.P.'s care. Father did not alert Mother to his change of address, which resulted in Mother calling law enforcement when she attempted to retrieve B.P. at Father's old address and was informed that Father had moved.

[13] Also in May of 2019, Father contacted Mother about B.P.'s participation in summer soccer and baseball. Mother responded via email that she would have to consult with her attorney about the matter. Mother never provided Father with further input on B.P.'s summer sports, so Father enrolled him and provided Mother with the schedule. Mother did not take B.P. to summer sports when he was in her care. On May 6, 2019, Father filed a verified motion "to address issues regarding custody and parenting time of [B.P.] and other issues described in this Petition." (Appellant's App. Vol. II, p. 72).

[14] Parents could not agree regarding Mother's desire that B.P. participate in Conduct Curb, which is a school for children who have severe autism. B.P. was receiving psychotherapy. Neither B.P.'s therapist nor his social worker recommended that B.P. participate in the intensive treatment offered by Conduct Curb.

[15] On June 25, 2019, Father filed a belated notice of intention to relocate with the trial court providing notice that he had moved to his new residence in New Castle. On June 26, 2019, Mother filed a contempt motion against Father alleging that he had not followed the required procedures for making medical and extracurricular activity decisions and had moved without filing a proper notice of intent to relocate. Mother also filed a motion seeking an order compelling B.P.'s attendance at Conduct Curb as well as a motion to have Dr. Kane removed as parenting coordinator. On June 27, 2019, Father filed a contempt motion against Mother for failing to provide him with the previously-ordered utility bill and proof of payment for the Prairie Knoll home.

[16] On July 3, 2019, the trial court held a hearing on Mother's motion to have Dr. Kane removed as parenting coordinator. Dr. Kane testified that she had a personal bias against Mother as a result of the allegations made by Mother in her removal petition and that "I don't think it's my competence that's in question, I think that it's [Mother] who has created this." (Tr. Vol. II, p. 22). On July 9, 2019, the trial court entered an order allowing Dr. Kane to withdraw from the case and directing her to file her final report with the court.

[17]  On August 5, 2019, Dr. Kane submitted her final report to the trial court. Mother had not been communicative with Dr. Kane regarding confirming her address, regarding her non-compliance with binding recommendations, inquiries about balances due, scheduling mediation, and her reasons for wishing to enroll B.P. in Conduct Curb. It was Dr. Kane's opinion that B.P. did not meet the diagnostic criteria for autism spectrum disorder, that he was responding very well to outpatient treatment, and that he did not require the intensive level of intervention offered by Conduct Curb. Dr. Kane observed that Mother had not participated in B.P.'s therapy for over a year, despite being asked by his therapist several times. Dr. Kane had spoken with B.P.'s previous therapist who believed that B.P.'s symptoms were the result of "high levels of anxiety related to chronic parental conflict and Attention Deficit Disorder." (Appellant's App. Vol. II, p. 89). It was Dr. Kane's opinion that B.P. was more than capable of learning in a general education classroom and that attending an intensive intervention school like Conduct Curb when it was not necessary could be demeaning for B.P. Dr. Kane observed that, given that Parents record of bypassing her and reporting issues directly to law enforcement, DCS, or filing motions with the court, it was unlikely that they would comply with parenting coordination in the future without imposition of consequences for non-compliance. Dr. Kane observed that Father had been arrested for domestic battery against his then-current partner in March of 2018, but that the charges were dismissed after Father participated in an intervention class and an online domestic violence course. Father was also receiving mental health services through the Veteran's Administration. Dr. Kane opined that

> [g]iven Mother's history of contempt of court and refusal to comply with recommendations, binding recommendations, orders from the court, as well as this [parenting coordinator's], the former [parenting coordinator's], DCS'S, and [Youth Services Bureau's] instructions, [B.P.'s] needs may be best met with Father as the primary custodian.

(Appellant's App. Vol. II, p. 91). Dr. Kane recommended that Mother pay the full balance owed to her in the amount of $3,645.50 within thirty days of the filing of the report.

[18] On August 14, 2019, the trial court held a hearing on all pending motions. Prior to beginning testimony, the trial court reviewed the issues to be addressed at the hearing. Joint legal custody was not mentioned as an issue. Father asked for primary custody of B.P. On cross-examination, Father confirmed that Parents had joint legal custody, that as primary physical custodian Mother made the majority of decisions about B.P., and that "[l]egally, I want to switch that, so I can make decisions based on . . . him." (Tr. Vol. III, p. 86). Father understood that, as joint custodians, he and Mother were supposed to work together on decisions about medical appointments and extracurricular activities, but that they only worked well together when Mother got what she wanted. When asked by Mother's counsel, "but my client, even if you get what you want, would still have joint legal custody rights, correct?" Father responded, "I believe so, yes, . . . As I understand it." (Tr. Vol. III, p. 98). Father testified that Mother would frequently fail to respond to his emails or would respond with a blank email. Mother would not answer Father when he asked about exercising parenting time on Fridays when he was off work and she was

working, as provided for in the MPA. Father had contacted Conduct Curb and learned that they recommended thirty-five hours of therapy per week. Father renewed his request that Mother be held in contempt for not providing him with a utility bill in her name and proof of payment for the Prairie Knoll home as directed by the court-approved MPA. Father requested $1000 in attorney's fees as a sanction.

[19] Mother acknowledged in her testimony that she did not provide Father with the required Prairie Knoll utility bill and proof of payment. Mother agreed it is in B.P.'s best interests to participate in sports and confirmed that she lived close to the location of his soccer and baseball practices. Mother testified that she believed that Father had taken B.P. to have three cavities filled unnecessarily just so that he could incur dental bills she would be required to pay. Mother did not present any testimony regarding what she believed she owed Dr. Kane in fees.

[20] On October 21, 2019, the trial court entered its Order on All Pending Matters in which it awarded primary physical and sole legal custody of B.P. to Father. The trial court found that a modification of physical custody to Father was merited because it was in B.P.'s best interests and because there had been a substantial and continuing change in several relevant factors, including Father's desire to have custody, Mother's ability to act in B.P.'s best interests, Mother's ability to exercise good judgment, and Mother's housing stability. The trial court noted Father's arrests for domestic battery with concern but found that Father was participating in mental health counseling, appeared to be acting in

B.P.'s best interests, was consistently employed, and was capable of providing for B.P.'s care. The trial court also noted that "Dr. Kane's report to the [c]ourt dated August 1, 2019, acknowledges that [B.P.'s] needs may be 'best met' with Father having primary physical custody." (Appellant's App. Vol. II, p. 31). The trial court found that it was no longer in B.P.'s best interests that Parents share joint legal custody, observing that they were "unable to communicate and cooperate regarding [B.P.]" (Appellant's App. Vol. II, p. 32).

[21] The trial court further found that Father had moved from his last residence without filing the required notice of intent to relocate as alleged by Mother in her contempt motion. The trial court admonished Father to strictly comply with the notice requirement in the future but chose not to sanction Father because Father had alerted his attorney to the move and because Mother had also moved without filing the required notice. The trial court found Mother in contempt for failing to comply with the provision of the MPA requiring her to provide a current utility bill in her name for the Prairie Knoll home and proof of payment. The trial court further found that Mother knew at the time that she signed the MPA that she could not provide what was required and that her actions "in connection with this provision represent a bad faith effort to mislead Father and the [c]ourt." (Appellant's App. Vol. II, p. 35). As a sanction, the trial court ordered Mother to pay Father's attorney $1000. The trial court also ordered Mother to pay the $3,645.50 that Dr. Kane indicated in her August 1, 2019, report was due to her.

[22] Mother now appeals. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

## I. *Custody*

### A. *Standard of Review*

Mother appeals the trial court's modification of legal and physical custody in favor of Father. This court recently stated our standard of review in custody matters as follows:

> We review custody modifications for an abuse of discretion with a preference for granting latitude and deference to our trial judges in family law matters. This is because it is the trial court that observes the parties' conduct and demeanor and hears their testimony firsthand. We will not reweigh the evidence or judge the credibility of the witnesses. Rather, we will reverse the trial court's custody determination only if the decision is clearly against the logic and effect of the facts and circumstances or the reasonable inferences drawn therefrom. [I]t is not enough that the evidence might support some other conclusion, but it must positively require the conclusion contended for by appellant before there is a basis for reversal. It is not impossible to reverse a trial court's decision regarding child custody on appeal, but given our deferential standard of review, it is relatively rare.

*Hecht v. Hecht*, 142 N.E.3d 1022, 1028-29 (Ind. Ct. App. 2020) (cleaned up).

Neither party requested that the trial court enter special findings pursuant to Indiana Trial Rule 52(A). When a trial court enters findings of fact and conclusions of law *sua sponte*, those findings control only with respect to the issues they cover, and the general judgment standard applies to issues upon which no findings were entered. *Ahls v. Ahls*, 52 N.E.3d 797, 800 (Ind. Ct. App. 2016). Where the trial court entered findings, we consider whether the findings

are supported by the evidence and whether the findings support the judgment. *Id.* We will only disregard a finding if it is clearly erroneous, meaning that there are no facts or inferences in the record to support it. *Id.* Matters falling under the general judgment standard are reviewed without reweighing evidence or considering witness credibility and may be affirmed upon any theory consistent with the evidence. *Baxendale v. Raich*, 878 N.E.2d 1252, 1257 (Ind. 2008).

## B. *Legal Custody*

[25] Mother's first challenge to the trial court's award of sole legal custody to Father is that the issue was not properly before the trial court. Mother argues that "[t]he parties had not agreed that the issue of joint legal custody would be contested and there was no written motion requesting a modification of legal custody." (Appellant's Br. p. 9). Father responds that Parents put legal custody at issue by filing open-ended requests to modify custody.

[26] In support of his argument, Father relies on *Higginbotham v. Higginbotham*, 822 N.E.2d 609, 610 (Ind. Ct. App. 2004), in which mother and father had joint legal custody of their child, with primary physical custody resting with mother. *Id.* Father subsequently filed a petition to modify custody, and the parties agreed to a custody evaluation. *Id.* The evaluator recommended that custody remain the same, with the addition of a parenting coordinator. *Id.* However, the evaluator further recommended that if the trial court decided to grant sole legal custody to one parent, it should be mother. *Id.* at 612. At the hearing on father's motion, the parties stipulated to the admission of the custody evaluation and agreed with its recommendations. *Id.* After the trial court

awarded sole legal and physical custody to mother, father appealed, arguing that the trial court had erred in modifying legal custody because the parties had not placed legal custody at issue. *Id*. In affirming the trial court, we noted that father's motion had requested an "open-ended" modification of custody after an evaluation and that the parties had agreed to the evaluator's recommendations about legal custody. *Id*. As such, we found the issue to be "squarely before the trial court." *Id*.

[27] Here, an examination of the substance of the entirety of Parents' motions reveals that their dispute pertained only to the physical custody of B.P. Legal custody was never mentioned by either party. Although Father is correct that, as in *Higginbotham*, he and Mother filed motions addressing "custody", *Higginbotham* is factually distinguishable because Father and Mother did not agree to abide by any third-party's custody evaluation. (Appellant's App. Vol. II, pp. 52, 54, 72). Other factors also lead us to conclude that the issue was not properly before the trial court. The MPA listed "physical custody, parenting time, child support and 2018 uninsured health expenses" as the only issues remaining to be addressed by the trial court. (Appellant's App. Vol. II, p. 69). Notably, at the beginning of the August 15, 2019, hearing on all pending matters, the trial court and the parties did not identify legal custody as a matter to be addressed.

[28] Neither do we find that Parents consented to try the issue of joint legal custody during the hearing. "[I]ssues raised by the pleadings can be altered by the evidence adduced at trial where the parties have impliedly or expressly

consented to new issues being tried." *Bailey v. Bailey*, 7 N.E.3d 340, 344 (Ind. Ct. App. 2014). Although Father asserted during the hearing that he wanted to legally change who made most of the decisions about B.P., when Mother's counsel observed that Mother would still have joint legal custody of B.P. even if Father received primary physical custody, Father affirmed that was his understanding. Thus, Mother did not believe that legal custody was in play, and Father did not indicate that he sought sole legal custody. Neither party submitted proposed findings of fact and conclusions requesting sole legal custody.

[29] It has been long-established that trial courts may not *sua sponte* order a change of custody. *See*, *e.g.*, *State ex rel. Davis v. Achor*, 225 Ind. 319, 327, 75 N.E.2d 154, 157 (1947)). On the facts and circumstances before us, we conclude that the trial court abused its discretion when it modified legal custody without a request from either party. Given that we reverse the portion of the trial court's Order granting sole legal custody to Father, we do not address Mother's argument that insufficient evidence supported the trial court's modification of legal custody.

## C. *Physical Custody*

[30] Mother also contends that the trial court's Order modifying primary physical custody of B.P. in favor of Father was clearly erroneous. Indiana Code section 31-14-13-6 provides that, after a custody order has been issued in a paternity proceeding, a trial court may not modify custody unless modification is in the best interests of the child and there is a substantial change in one or more of the

factors that the trial court may consider under Indiana Code section 31-14-13-2 (Section 2), including:

(1) The age and sex of the child.

(2) The wishes of the child's parents.

(3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.

(4) The interaction and interrelationship of the child with:

(A) the child's parents;

(B) the child's siblings; and

(C) any other person who may significantly affect the child's best interest.

(5) The child's adjustment to home, school, and community.

(6) The mental and physical health of all individuals involved.

(7) Evidence of a pattern of domestic or family violence by either parent.

(8) Evidence that the child has been cared for by a de facto custodian, and if the evidence is sufficient, the court shall consider the factors described in section 2.5(b) of this chapter.

[31]     Here, the trial court concluded that the grant of primary physical custody to Father was appropriate because it was in B.P.'s bests interests and there had been a substantial and continuing change "in multiple relevant factors," including Father's desire to have primary physical custody, Mother's repeated and continuing refusal to act in B.P.'s best interests, and Mother's unstable housing situation. (Appellant's App. Vol. II, p. 31). The trial court also found that Mother's evasiveness and dishonesty to the trial court about the fact that she was no longer living at the Prairie Knoll home raised serious concerns about her judgment. These conclusions were supported by the trial court's findings and evidence in the record that Mother ignored Dr. Kane's binding recommendations about 2018 summer parenting time and B.P.'s participation in summer sports, Mother desired to enroll B.P. in Conduct Curb despite the fact that B.P.'s therapist and social worker advised against it, Mother failed to pay two parenting coordinators, she failed to pay her share of B.P.'s medical expenses, she had home evaluations at three separate homes during the DCS informal adjustment, and she lied to the MPA mediator, Father, and the trial court about continuing to live at Prairie Knoll. The trial court's best interests conclusion was further supported by its findings based on evidence in the record that Father had been consistently employed, was capable of providing for B.P., owned his own home, and had ensured that B.P. arrived at school on time. Because the trial court's findings and conclusions were supported by evidence in the record, we cannot say that they were clearly erroneous. *See Ahls*, 52 N.E.3d at 800.

[32] Mother argues otherwise because she contends that the trial court only found that one factor expressly listed in Section 2 had changed, namely, Father's desire for custody, and that there was no substantial change in that factor because Father had always wanted custody. Section 2 provides that a trial court "shall determine custody in accordance with the best interests of the child" in light of "*all relevant factors*, including [the enumerated factors]." (Emphasis added). Thus, the trial court must consider what is in the best interests of the child, and the factors enumerated in the statute are not exclusive. Here, the trial court found a substantial and continuing change in one listed statutory factor, Father's desire to have custody, as well as three non-enumerated factors, namely, Mother's failure to act in B.P.'s best interests, her poor judgment, and her unstable housing situation. In addition, custody was established by a paternity order in 2012, and Father filed his first request to change custody on March 16, 2018, with his notice to relocate. Therefore, there was a substantial change in the one statutorily-enumerated factor found by the trial court.

[33] Mother also challenges the trial court's finding that Dr. Kane recommended primary physical custody rest with Father. Mother contends that the trial court should not have considered Dr. Kane's recommendation because "[b]y offering a custody evaluation, she acted on her bias against . . . Mother and violated her own charge from the [c]ourt in making a custody evaluation." (Appellant's Br. pp. 12-13). We find this argument to be unpersuasive for at least two reasons. First, the trial court's order appointing Dr. Kane merely provided that she was

not allowed to "serve as a custody evaluator in the case" or "offer a binding recommendation for change in [B.P.'s] primary physical residence," not that she could offer no opinion on the subject at all. (Appellant's App. Vol. II, p. 47). There is no indication in the record that Dr. Kane acted as a formal custody evaluator in this matter or that the trial court considered the recommendation contained in Dr. Kane's report to be binding on it or the parties. In addition, the same trial court judge presided over both the hearing on Mother's petition to remove Dr. Kane and the final hearing in this matter. The trial court judge was, therefore, aware of the interaction of the parties with Dr. Kane and what Dr. Kane had said at the hearing about her personal bias against Mother. It was within the trial court's discretion to credit or discredit Dr. Kane's recommendation regarding physical custody in light of any potential bias on Dr. Kane's part and, as we are not allowed to reweigh the evidence, Mother's argument is contrary to our standard of review. *See Hecht*, 142 N.E.3d at 1029.

[34] Mother also draws our attention to evidence in the record that Father had moved six times since paternity had been established, Father had a pattern of domestic violence that the trial court should have taken into account, and the trial court disregarded Father's testimony "about his ongoing mental health treatments for anxiety and his belief that he has Post Traumatic Stress Disorder." (Appellant's Br. p. 12). These arguments are also contrary to our standard of review in that crediting them would entail consideration of evidence that does not support the trial court's determination and/or a reweighing of the

evidence. *See Hecht*, 142 N.E.3d at 1029. Mother's argument regarding Father's mental health also mischaracterizes the record, as Father did not testify at the August 15, 2019, hearing that he believed he had PTSD, and he specifically denied that he had been formally diagnosed with PTSD. Given the ample evidence supporting the trial court's findings and conclusions, Mother has failed to meet her burden of persuasion on appeal to show that the evidence "positively require[d] the conclusion" that she have primary physical custody of B.P. *See id.*

## II. *Contempt*

[35] Mother next challenges the trial court's grant of Father's motion seeking to have her held in contempt for failing to produce a utility bill with proof of payment in her name for the Prairie Knoll home and the trial court's award of $1000 in attorney fees. "Civil contempt is failing to do something that a court in a civil action has ordered to be done for the benefit of an opposing party." *P.S. v. T.W.*, 80 N.E.3d 253, 256 (Ind. Ct. App. 2017). Trial courts have the inherent power to punish litigants in order to maintain the dignity of the court, secure obedience to process and rules, rebuke interference with the orderly conduct of business, and to punish unseemly behavior. *City of Gary v. Major*, 822 N.E.2d 165, 169 (Ind. 2005). Whether a party is in contempt is a matter left to the sound discretion of the trial court, and we will reverse a trial court's finding of contempt only if no evidence or inferences exist in the record to support it. *P.S.*, 80 N.E.3d at 256.

[36] The gravamen of Mother's argument regarding the trial court's contempt finding is that it was unjust for her to be held in contempt for failing to file the required notice of relocation when Father did the same thing and was not held in contempt. However, Mother's argument is based on a mischaracterization of the trial court's ruling. The trial court did not find her in contempt for failing to file a notice to relocate; rather, it held her in contempt for failing to produce to Father the utility bill and proof of payment in her name for the Prairie Knoll home as she was required to do once the trial court approved the parties' MPA and for entering into the MPA knowing that she could not produce those things. The trial court found that "Mother's actions in connection with this provision [of the MPA] represent a bad faith effort to mislead Father and the [c]ourt." (Appellant's App. Vol. II, p. 35). Mother does not address the evidence in the record supporting the trial court's findings regarding her knowing violation of the MPA. As such, she has failed to persuade us that the trial court acted outside of its discretion by finding her in contempt. *See P.S.*, 80 N.E.3d at 256.

[37] As to the trial court's award of $1000 in attorney's fees to Father, Mother argues that this portion of the trial court's Order was clearly erroneous because there was no evidence to support an award in that amount. Regardless of consideration of economic resources, once a party is found in contempt, the trial court has the inherent authority to compensate the aggrieved party for losses and damages resulting from another's contemptuous actions, including an award of attorney's fees. *Scoleri v. Scoleri,* 766 N.E.2d 1211, 1222 (Ind. Ct.

App. 2002). "The determination of damages in a contempt proceeding is within the trial court's discretion, and we will reverse an award of damages only if there is no evidence to support the award." *City of Gary*, 822 N.E.2d at 172.

[38] We agree with Mother that there was no evidence in the record to support the trial court's award of $1000 in attorney's fees to Father. Although Father testified that he sought an award of $1000 in fees for his contempt motion, he presented no evidence to support that request such as an attorney's fee affidavit, testimony establishing his attorney's fee schedule and the time and expenses incurred on the contempt motion, or even testimony that he had been billed that amount for services rendered in connection with the contempt motion. Because no evidence supported the award, we find it to be an abuse of the trial court's discretion and clearly erroneous. *See id.*; *see also Ahls*, 52 N.E.3d at 800. Accordingly, we vacate the portion of the trial court's Order awarding Father $1000 in attorney's fees in relation to his contempt motion.

### III. *Dr. Kane's Fees*

[39] Mother argues that the portion of the trial court's Order directing her to pay $3,645.50 is clearly erroneous because "there is no evidence to support this disproportionate award of parenting coordinator fees[.]" (Appellant's Br. p. 14). However, Dr. Kane's final report was filed with the trial court without objection by either party. In her report, Dr. Kane recommended to the trial court that Mother pay her the full balance owed for her services in the amount

of $3,645.50. Therefore, there was evidence in the record to support the trial court's Order, and it is not clearly erroneous. *See Ahls*, 52 N.E.3d at 800.

[40] Mother also argues that the trial court's Order that she pay $3,645.50 while ordering Father to pay only $593.75 in parenting coordinator fees was clearly erroneous because it contravened the parenting coordinator appointment order directing Parents to split those fees evenly. However, Mother's argument overlooks the fact that the parenting coordinator appointment order also provided that Dr. Kane had the authority to "charge either party separately for individual contacts with that party or joint contacts made necessary by that party's behavior." (Appellant's App. Vol. II, p. 43). Therefore, Dr. Kane had the authority to charge Mother more than Father. Because the trial court's Order was within the parameters of its previous order appointing Dr. Kane, its determination that Mother should pay $3,645.50 in fees was supported by the record and was, therefore, not clearly erroneous. *See Ahls*, 52 N.E.3d at 800.

## CONCLUSION

[41] Based on the foregoing, we conclude that the issue of legal custody was not properly before the trial court and that its award of $1000 in attorney's fees to Father was clearly erroneous. Accordingly, we vacate those portions of the trial court's Order. We also conclude that the trial court's grant of primary physical custody, its finding that Mother was in contempt, and its order that Mother pay $3,645.50 in parenting coordinator fees were not clearly erroneous.

[42] Affirmed in part and reversed and vacated in part.

[43]     Mathias, J. concurs

[44]     Tavitas, J. concurs in result with separate opinion

Virginia Madden,

*Appellant-Respondent,*

v.

Robert Phelps,

*Appellee-Petitioner.*

Court of Appeals Case No.
19A-JP-2630

**Tavitas, Judge, concurring in result**

[1]     I concur in the result reached by the majority; however, notwithstanding Mother's failure to object below,[1] I write separately regarding Dr. Kane's recommendation that "[the Child's] needs may be best met with Father as the primary custodian[.]"  Appellant's App. Vol. II p. 91.

[2]     Not only did Dr. Kane exceed the scope of her duties, as outlined in the trial court's order, but she also became an advocate.  When parties work with a court-appointed parenting coordinator, they expect to be aided by a neutral official in resolving their disputes.  The parties do not expect the parenting coordinator to simultaneously assess the parties for the court or to advocate

---

[1] Mother did not object to Dr. Kane's recommended change in custody by filing a petition for a hearing in the manner prescribed by the trial court's order appointing Dr. Kane.  *See* Appellant's App. Vol. II pp. 44-45.

regarding such matters as custody. This is the first step down a slippery slope because such conflation of roles can sabotage the parent coordination process.